U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 13, 2009**                               **United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| GLEN BRADLEY BURKS AND | § | CASE NO. 08-20346-RLJ-7 |
| TINA LEIGH BURKS, | § | |
| | § | |
| DEBTORS | § | |

### MEMORANDUM OPINION

The Court considers the motion of the United States Trustee ("UST") seeking dismissal of the chapter 7 case of the above-named debtors, Glen and Tina Burks (the "Burks" or "Debtors"). The UST submits that this chapter 7 filing is an abuse of the provisions of chapter 7 and must be dismissed under section 707(b)(2) or (b)(3) of the Bankruptcy Code.

The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b); this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). This Memorandum Opinion contains the Court's findings of fact and conclusions of law. Bankruptcy Rule 7052.

**Findings of Fact**

The Debtors and the UST submitted Stipulations of Fact in connection with the hearing on the UST's motion to dismiss. The stipulations are set forth as follows:

<u>Personal Information</u>

1. Glen and Tina Burks ("Debtors") voluntarily filed for relief under Chapter 7 of the Bankruptcy Code on June 6, 2008. The case was not filed as the immediate result of any unanticipated financial hardship.

2. They live in Amarillo, Texas. They have been married 9 years. They have one dependent, a 10 year-old son who is in 4th grade at Tradewinds Elementary School, a public school.

3. Mr. Burks is 31 years old, and employed by Bell Helicopter as a flight supervisor. He has been employed by Bell Helicopter for approximately 2 years. He has no immediate reason to doubt the security of his current employment, although Bell Helicopter just has announced that the company will lay-off 500 workers, with 30 of those job lay-offs coming in Amarillo. His position, though, has survived this first round of cuts.

4. Mrs. Burks is 33 years old and is not employed outside the home.

<u>The Debtors' Home and Mortgage</u>

5. The Debtors own their home. They purchased it in January of 2006 with a fixed 6.25% interest rate mortgage from Countrywide Home Loans. Using a fair market value, they valued the home on their Schedules as $142,000.00. At the time they filed this case, their monthly payment, including principal, interest, taxes and insurance, was $1,113.00. However, as of June 2008 the escrow was adjusted, and their monthly payment is now $1,183.00.

<u>The Debtors' Income (Schedule I & J)</u>

6. Mr. Burks is paid every two weeks. He listed on Schedule I $6,125.23 in regular gross monthly income and $291.49 in gross overtime pay. From that is deducted each month $1,273.33 for withholding taxes, including social security taxes, $311.12 for medical/dental/life insurance. Also deducted is $83.21 each two weeks for repayment of a loan from a voluntarily settled "401K" plan maintained and administered by his employer. It also includes deductions for a flexible heath (sic) spending account. As listed on Schedule I, the Debtors' total net monthly income

is $4,832.27. Mr. Burks has not voluntarily changed his payroll tax withholding exemptions in the last two years. At the time this case was filed, Schedule I accurately reflects the Debtors' typical monthly income and deductions therefrom. Schedule I identifies no anticipated changes in income for the year following their filing of this case.

    7. The Debtor's pay advices for all pay dates ending between December 1st, 2007, and the date of filing (June 26, 2008) identify the following information;

| Pay date | Normal Hours | Overtime Hours | Gross Pay | Net Pay |
|---|---|---|---|---|
| 12/13/07 | 80 | 0 | $2,677.11 | $1,976.87 |
| 12/28/07 | 80 | 14 | $3,445.61 | $2,493.35 |
| 1/11/08 | 80 | 0 | $2,677.11 | $1,977.04 |
| 1/25/08 | 80 | 10 | $3,011.75 | $2,205.00 |
| 2/8/08 | 80 | 12 | $3,078.68 | $2,266.92 |
| 2/22/08 | 80 | 14 | $3,145.61 | $2,295.15 |
| 3/7/08 | 80 | 0 | $2,677.11 | $1,957.70 |
| 3/21/08 | 80 | 0 | $3,177.11 | $2,313.79 |
| 4/4/08 | 80 | 0 | $2,677.11 | $1,953.42 |
| 4/18/08 | 80 | 0 | $3,452.03 | $2,518.22 |
| 5/2/08 | 80 | 0 | $2,827.03 | $2,073.67 |
| 5/16/08 | 80 | 0 | $2,827.03 | $2,093.00 |
| 5/30/08 | 80 | 0 | $2,827.03 | $2,073.66 |
| 6/13/08 | 80 | 0 | $2,827.03 | $2,093.01 |

In the applicable six-month pre-petition period (income that the debtor received during the six month period ending on the last day of the calendar month immediately preceding the date of commencement -- December 1, 2007 through May 31, 2008) the Debtors' gross income totaled $38,500.32. When divided by 6 months, the Debtors' average monthly gross income was $6,416.72. The Debtors identified an average gross monthly income on Line 3 of the Form B22 ("Means Test") of $6,416.71. The "total currently (sic) monthly income" listed in line 12 is $6,618.44. the final means test figure is higher than the average monthly wages due to a one-time cash-in of his 401k retirement that averaged $201.73 during the applicable six month pre-petition period.

The Debtors' Debts and Schedules I and J

    8. The Debtors scheduled $185,680.90 in secured debts. When this case was filed, these consisted of a $129,597.86 purchase money loan secured by their home, a $30,108.03 loan from Ford Motor Credit secured by a 2006 Ford F-150 pick-up, and $25,975.01 purchase money loan from Ford Motor Credit secured by a 2006 Mercury Mountaineer. They are current on the payments for the Mountaineer. The Debtors

intend to reaffirm the debt on their homestead, and have reaffirmed the debt secured by the Mountaineer. They have agreed to surrender the F-150.

9. As shown on Schedule J, the Debtors' monthly expenses total $4,961.00. This includes the $625.00 payment on the Ford F-150. When this vehicle is surrendered, this payment will not be made, and their Schedule J monthly expenses can be reduced to $4,336.00. However, a replacement vehicle of some kind will need to be purchased for a second form of transportation for the family. The Debtors are trying to find a vehicle for less than $400 per month. The auto insurance expense of $149.00/month and transportation expense of $35.00/month will also change as a result of the change in vehicles. The exact amount is as of yet undetermined, so the impact on the estimated expenses in Schedule J for insurance and transportation expense (fuel, maintenance, etc.) might be lower.

10. Incorporating a $250 reduction in the monthly cost of a second vehicle and related expenses into a reconciliation of Schedules I and J, might leave additional disposable income.

<u>Surrender of Vehicle and Form B-22</u>

11. The Debtors did own, operate, and have possession of the Ford F-150 vehicle at the time of filing. They initially indicated on their Statement of Intention to reaffirm the debt on this vehicle. However, they have since surrendered it. The standard vehicle deduction taken on Line 23, the transportation operation allowance taken in Line 22A, and the calculation of future payments in Line 42b of the B-22 form was accurate as of the date of filing. Prospectively, if this vehicle is replaced, then the allowable deductions in Line 23 and Line 22A of the B-22 form would not change, and so long as the average of the payment over a 60-month period did not exceed $489 for a replacement car, the actual means test figures would not change under either a Form B-22A or Form B-22C.

<u>Debts</u>

12. The Debtors scheduled no priority debts.

13. The Debtors scheduled $33,943.76 in unsecured debts. These are primarily to credit card companies and are comprised of primarily consumer debts. Added to these unsecured debts to be discharged in this case will be the deficiency balance likely to be owed on the Ford F-150 vehicle surrendered to Ford Motor Credit post-bankruptcy. The Debtors have not operated a proprietorship or other significant business concern in the last two years.

<u>The Means Test Calculations and Charitable Contributions</u>

- 4 -

14. The Debtors' Means Test identifies their monthly income in the six months preceding the filing of this case as $6,416.71 per month. This is above the applicable median income for Texas, and required them to complete the balance of the Means Test.

15. The Means Test's calculation of their "disposable income" as shown on Line 50 was $130.00. This is below the $182.50/month of disposable income needed to trigger the presumption of abuse under 11 U.S.C. §727(b)(2).

16. In calculating the $130.00/month disposable income, the Debtors identified $433.33/month in continued charitable contributions.

17. The United States Trustee requested documentation from the Debtors memorializing their pre-petition charitable giving. The Debtors provided their 2007 tax "checklist", receipts evidencing $885.00 in cash contributions, and their bank statements. The bank statements bear no indication of any contributions to any charity. Their tax "checklist" identifies $4,197.00 in "Cash or other Money Donations" in 2007. To the best of the Debtors' knowledge, the $4,197.00 shown on their tax checklist is the charitable deduction reported to the IRS on their 2007 tax return. The only documents they provided were five tickets to "Homers Backyard Ball at $27.00 each (only part of which is tax deductible), a receipt dated June 4, 2008, for a $250.00 contribution to the National MS Society, and a receipt dated June 10, 2008 (post-petition) for a $100.00 cash contribution to a women's shelter. Much of the amount claimed as a charitable deduction on their 2007 tax return was for donated personal property. There are no receipts to either identify the property given or the amount of contributions attributable to donated personal property. Over a one-year period, the $4,197.00 in charitable donations claimed on their 2007 tax return averages $349.75/month. The $385.00 of documented cash given and/or spent on charitable giving/functions averages over a one-year period to $32.08/month.

18. Leaving the balance of their means test as originally submitted (including the originally stated average monthly gross income), and allowing them $100.00 per month for charitable contributions, the Debtors have $399.81 in "disposable income". This amount, when multiplied by 60, is $23,988.60, which exceeds $10,950.00, the amount required to "trigger" the presumption of abuse under 11 U.S.C. §707(b)(2).

19. Allowing for all other expenses on Schedule J as originally stated, but reducing the expense for charitable contributions to $100.00 per month, the Debtors would have $171.27 per month in disposable income.

20. If the Debtors had filed a Chapter 13 and/or converted to Chapter 13, and used the all of the figures as of the date of filing (without reducing charitable tithing

and giving), their hypothetical Form B-22C would allow an additional deduction in Line 55 for his 40lk contributions of $128.32/month and his 401k loan (TSP loan) of $180.29/month, resulting in a "disposable income" figure in Line 59 of negative $178.55.

21. Subsequent to the United States Trustee's original inquiry, the Debtors produced the following receipts:

a) $400.00 contributed to a women's shelter dated July 11, 2008;

b) $800.00 contributed to the Brockton Joy of Pentecost dated August 30, 2008;

c) $30.00 contributed to the United Way dated September 21, 2008;

d) $20.00 contributed to CASA dated September 6, 2008;

e) a commitment pledge to the United Way dated 10/7/08 for 2008-2009 in the amount of $1,000, with deductions to come out of his pay at Bell Helicopter; and

f) $125 contributed to the United Way on October 25, 2008.

22. All donations, gifts, and pledges have been made to a qualified religious or charitable organization as defined by 11 U.S.C. §548(d)(4). All charitable contributions referenced in paragraph 21, above, meet the definition under 11 U.S.C. §548(b)(3). All contributions, both before and after filing, are less than 15 percent of gross income, and are protected under 11 U.S.C. §548(a)(2).

## The Debtors' Post-Petition Income

23. The Debtor's pay advices for pay periods ending between July 4, 2008, and September 26, 2008, identify the following information by pay date;

| Paydate | Normal Hours | Overtime Hours | Gross Pay | Net Pay |
| --- | --- | --- | --- | --- |
| 7/11/08 | 80 | 0 | $3,302.03 | $2,412.91 |
| 7/25/08 | 80 | 0 | $2,952.03 | $2,157.84 |
| 8/8/08 | 80 | 0 | $2,827.03 | $2,092.99 |
| 8/22/08 | 80 | 0 | $2,827.04 | $2,073.67 |
| 9/5/08 | 80 | 0 | $2,827.03 | $2,073.65 |
| 9/19/08 | 80 | 0 | $2,827.03 | $2,092.99 |
| 10/3/08 | 80 | 0 | $2,827.04 | $2,073.67 |

The difference in pay for the July 4 paycheck is attributable to the increased pay rate for hours worked during the 4th of July holiday, rather than overtime. Mr. Burks has not worked or been paid for any overtime in six months. His average gross wage income over the last six months (May 1st through October 31st) is $5,801.90. His average gross wage income over the last 11 months (Dec. 1st 2007 through October 31, 2008) is $5,867.60.

24. Other than a reduction in pay due to the elimination and/or lack of overtime, a surrender of their Ford F-150, and the need to replace this vehicle, all discussed above, the Debtors' circumstances have not materially changed since they filed this case.

25. No creditors have filed objections to the Debtors' discharge.

26. The Debtors have elected not to voluntarily convert this case to Chapter 13.

**Discussion**

The parties center their dispute on the Debtors' $433 per month charitable contribution and how such charitable contribution should be treated in connection with the provisions of section 707(b) of the Bankruptcy Code. The UST contends that the Debtors' charitable contribution is too high given the Debtors' failure to establish a past pattern of giving in the amount claimed. If, the UST argues, the contribution is reduced to, say, $100 a month, the additional available income causes the Debtors' "disposable income" to well exceed the threshold amount under the means test calculation provided for at subsection (b)(2) of section 707. Their case is, therefore, presumptively abusive, the UST submits. In addition, the UST argues, such additional income would allow the Debtors to pay their creditors in a chapter 13 proceeding; their ability to pay in a hypothetical chapter 13 case justifies dismissal of the Debtors' case as a bad faith filing under subsection (b)(3) of section 707.

The Debtors, on the other hand, contend that their charitable contribution is "not inconsistent with prior giving . . ." and, besides, the clear wording of section 707(b)(1) expressly prohibits consideration of their charitable contribution in determining whether their case should be dismissed. The Debtors also argue that the facts and circumstances of their case reflect that it is filed in good faith thereby defeating the UST's section 707(b)(3) claim.

Subsection (b)(3) of section 707 applies to a case in which the presumption of abuse (derived from the calculation under subsection (b)(2)) does *not* arise. The Court must therefore first consider dismissal under subsection (b)(2). But, in doing so, the Court notes that section 707(b)(1) provides that the court *may* dismiss an individual debtor's chapter 7 case whose debts are primarily consumer debts "if it finds that the granting of relief would be an abuse of the provisions of [chapter 7]. In making a determination of whether to dismiss a case under this section, the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions . . . ." 11 U.S.C. § 707(b)(1).

Section 707(b)(2) contains the so-called "means test" to determine if the case is presumptively abusive thereby justifying dismissal of the case under section 707(b)(1). 11 U.S.C. § 707(b)(2). As part of the formula for the means test, a debtor uses the National and Local Standards promulgated by the IRS for the area in which the debtor lives. § 707(b)(2)(A)(ii)(I). These amounts cover average costs for housing, transportation, health care, food, clothing, utilities, etc. *See* Collection Financial Standards, http://www.irs.gov/individuals/article/ 0,,id=96543,00.html (last visited Nov. 18, 2008). Along with deducting these expenses, a debtor may deduct "Other Necessary Expenses issued by the Internal Revenue Service." § 707(b)(2)(A)(ii)(I). The Internal Revenue Manual § 5.15.1.10 defines what constitutes "Other

Necessary Expenses," and provides a test for determining whether a particular expense is allowed. Internal Revenue Manual § 5.15.1.10, *available at* http://www.irs.gov/irm/part5/ch15s01.html#d0e216108 (last visited Nov. 18, 2008); *see also*, *In re Diagostino*, 347 B.R. 116, 118-19 (Bankr. N.D.N.Y. 2006) (addressing test promulgated under Internal Revenue Manual for Other Necessary Expenses).

The test provided by the Internal Revenue Manual, called the "necessary expense test," requires that such expenses must "provide for the health and welfare of the [debtor] and/or his or her family or they must be for the production of income." Internal Revenue Manual § 5.15.1.10. The manual provides different examples of expenses that satisfy the test such as accounting and legal fees, child care, dependent care, education, life insurance, etc. *Id*. In particular, the manual also includes charitable contributions. *Id*. A charitable contribution is a necessary expense if it is a condition of the debtor's employment or meets the necessary expense test. *Id*.; *In re Diagostino*, 347 B.R. at 119. The Internal Revenue Manual provides the example of a priest who is required to tithe his income according to his employment contract. Internal Revenue Manual § 5.15.1.10. Otherwise, a debtor must show that the contributions are for the health and welfare of the debtor or his family, or the contributions are for production of income. *See In re Diagostino*, 347 B.R. at 119. If the test is satisfied, the debtor may include charitable contributions as an expense in his means test calculations. *See id.*

Mr. Burks testified at the hearing; his testimony and the stipulations provide scant evidence of actual charitable contributions made prior to the bankruptcy filing that approximate the $433 amount now claimed. A "checklist" for a tax return that is not corroborated with receipts or copies of checks does not constitute credible proof of charitable contributions. No attempt was

made to identify in-kind contributions. Mr. Burks' job obviously does not require that he contribute a tithe as a condition of employment. The Debtors' need or desire to make a $433 a month charitable contribution appears to have arisen post-petition. In short, the evidence does not allow the Court to conclude that the charitable contributions claimed here either promote the health and welfare of the Burks in any tangible way, or otherwise help in the production of income. The Debtors' charitable contributions cannot be included on the expense side of the means test. *See id.* It is undisputed that removing the Burks' charitable contribution from the means test calculation under subsection (b)(2) raises the presumption of abuse. The Debtors did not attempt to establish any special circumstances to rebut the presumption. *See* § 707(b)(2)(B).

Given that the presumption of abuse arises here, the Court need not address the UST's subsection (b)(3) claim of bad faith. The Court's analysis is not over, however. The wording of subsection (b)(1), which is, in a sense, the introductory paragraph to the dismissal-for-abuse provisions of section 707, provides that the bankruptcy court *may* dismiss if abuse exists and, in considering whether to dismiss, the bankruptcy court *may not* consider whether the "debtor has made or continues to make, charitable contributions . . . ." The use of the permissive *may* implies that the Court has some discretion in deciding whether to dismiss a case upon a finding of abuse. *See In re Skvorecz*, 369 B.R. 638 (Bankr. D. Colo. 2007). In addition, the Court must resolve whether it is taking the Debtors' charitable contributions into consideration in deciding whether to dismiss this case. On this second point, the Court is satisfied that the facts and circumstances of this case require the Court to conclude that there is a presumption of abuse in this case. This is derived from simply following the dictates of the means test set forth at subsection (b)(2)(A) of section 707. Under such provision, the Debtors are allocated certain defined expenses. The

allowed expenses do not include the type of charitable contribution made here. As the charitable contribution is not included in the formula, the Debtors' income exceeds the threshold thereby triggering the presumption of abuse. By finding abuse, the Court is not assessing the propriety of the Debtors' charitable contribution; the Court is not deciding that the charitable contribution is not justified because there has been no proven pattern or history of having made such charitable contribution. The parties are arguing over whether the charitable contribution is excessive or not; the Court is simply applying the mathematical calculations dictated by the statute. It is not considering the charitable contribution as it does not fall within the expenses the Debtors are allowed to take under the statute. As a result, the chapter 7 filing here is presumptively abusive.

On the question of whether the use of "may" in section 707(b)(1) means the Court has discretion to dismiss (or not) upon a finding of abuse, the Court notes that two lines of authority have arisen. *Compare In re Haman*, 366 B.R. 307, 311 (Bankr. D. Del. 2007) (holding that once presumption arises and is not rebutted the court must dismiss) *with In re Skvorecz*, 369 B.R. at 642-43 (holding that court has discretion to dismiss case even though presumption of abuse arose). The discretion implied by "may" has also been construed to grant discretion to the court to merely choose whether to dismiss or to convert the case. *In re Justice*, No. 07-5231, 2008 WL 4368668 *5 (W.D. Ark. Sept. 22, 2008).[1] Regardless of the nature of the Court's discretion, or

---

[1]This interpretation is arguably supported by a straightforward reading of subsection (b)(1):

> . . . the court . . . *may dismiss a case* filed by an individual debtor under this chapter . . . *or, with the debtor's consent, convert such a case to a case under chapter 11 or 13* . . . if it finds that the granting of relief would be an abuse of the provisions of this chapter.

11 U.S.C. § 707(b)(1) (emphasis added).

whether the Court even has discretion, the Court is satisfied that the facts here require dismissal. The Debtors did not attempt to rebut the presumption of abuse. *See* § 707(b)(2)(B) (sets forth the only grounds for rebutting the presumption of abuse). The Debtors did not present the Court with any evidence of any definitive fact or circumstance that would justify a decision not to dismiss. *See In re Mravik*, 08-28754-svk, 2008 WL 5423108, at *6 (court held that dismissal under section 707(b) is permissive, but the discretion to deny a motion to dismiss for presumed abuse should not be exercised lightly). The Court recognizes that the stipulations reflect that, in a chapter 13 case, the Debtors' disposable income would be negative and unsecured creditors would not receive a distribution. In deciding whether to dismiss a case that is presumptively abusive, the Court is not inclined to consider a hypothetical chapter 13 scenario. *See In re Castle*, 362 B.R. 846, 851-52 (Bankr. N.D. Ohio 2006).

## Conclusion

Upon the foregoing authorities, the Court concludes that this chapter 7 case must be dismissed in accordance with section 707(b)(1) and (2) of the Bankruptcy Code.

### End of Memorandum Opinion ###